CASE NOS. 25-13298-E, 25-13698-E

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

PEN AMERICAN CENTER, INC., et al., Plaintiffs-Appellees,

v.

KEVIN ADAMS, et al., Appellants.

25-13298-E

PEN AMERICAN CENTER, INC., et al., Plaintiffs-Appellees,

v.

CARISSA BERGOSH, et al., Appellants.

25-13698-E

Appeals from the United States District Court
for the Northern District of Florida

BRIEF OF PLAINTIFFS/APPELLEES

Lynn B. Oberlander
Taylor Washburn
Michael R. McDonald
**BALLARD SPAHR LLP**
1675 Broadway, 19th Floor
New York, NY 10019-5820
Telephone: 212.223.0200

Shalini Goel Agarwal
Ori Lev
**PROTECT DEMOCRACY
PROJECT**
2020 Pennsylvania Ave. NW, Ste. 163
Washington, DC 20006
Telephone: 202.579.4582

**Attorneys for Plaintiffs/Appellees**

## STATEMENT REGARDING ORAL ARGUMENT

Appellees respectfully submit that oral argument would aid the Court in the decision process by enabling the Parties to address any questions concerning the applicability of the legislative privilege in this case.

**TABLE OF CONTENTS**

**Page**

STATEMENT REGARDING ORAL ARGUMENT ................................................i

TABLE OF AUTHORITIES ..........................................................................iv

STATEMENT OF JURISDICTION..................................................................1

STATEMENT OF THE ISSUES.......................................................................2

STATEMENT OF THE CASE..........................................................................3

I.      NATURE OF THE CASE....................................................................3

II.     STATEMENT OF THE FACTS ..........................................................4

III.    COURSE OF PROCEEDINGS..........................................................10

IV.     STANDARD OF REVIEW ...............................................................17

SUMMARY OF THE ARGUMENT ................................................................17

ARGUMENT ...................................................................................................18

I.      The District Court Correctly Held that the Board's Decisions to Remove Specific Books from School Libraries Were Administrative .................................................................................18

        A.      The Applicable Legal Standard Focuses on Whether an Act Is Policymaking (Legislative) or Applying an Existing Policy (Administrative) ........................................................18

        B.      The Decisions to Remove Specific Books from School Libraries Were Administrative.................................................23

        C.      Appellants' Arguments to the Contrary Are Unavailing ....................29

                1.      Appellants' "Totality" of Factors Argument Fails ....................29

                2.      *Crymes* Supports the District Court's Orders .........................35

                3.      Appellants Misunderstand *Ellis* .............................................40

ii

CONCLUSION ......................................................................................45

CERTIFICATE OF COMPLIANCE ....................................................47

CERTIFICATE OF SERVICE ..............................................................48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*75 Acres, LLC v. Miami-Dade County*,
    338 F.3d 1288 (11th Cir. 2003) ...................................................................35, 36

*ACLU of Florida, Inc. v. Miami-Dade County School Board*,
    557 F.3d 1177 (11th Cir. 2009) ..........................................................................3

*Baytree of Inverrary Realty Partners v. City of Lauderdale*,
    873 F.2d 1407 (11th Cir. 1989) ...................................................................37, 38

*Bogan v. Scott-Harris*,
    523 U.S. 44 (1998).............................................................21, 31, 32, 42, 45

*Brown v. Crawford County*,
    960 F.2d 1002 (11th Cir. 1992) ......................................... 13, 20, 27, 34, 35, 38

*Brunson v. PHH Mortgage Corp.*,
    342 F.R.D. 315 (M.D. Fla. 2022) ....................................................................12

*Bryant v. Jones*,
    575 F.3d 1281 (11th Cir. 2009) ....................................................20, 21, 27, 44

*Code Revision Commission for General Assembly of Goergia v.
    Public.Resource.Org, Inc.*,
    906 F.3d 1229 (11th Cir. 2018) ........................................................................43

*Common Cause Florida v. Byrd*,
    674 F. Supp. 3d 1097 (N.D. Fla. 2023) ...........................................................18

*Corn v. City of Lauderdale Lakes*,
    997 F.2d 1369 (11th Cir. 1992) .............................. 19, 21, 22, 27, 31, 32, 35, 38

*Crymes v. DeKalb County, Georgia*,
    923 F.2d 1482 (11th Cir. 1991) .................. 13, 19, 21, 22, 23, 28, 31, 32, 34, 38

*Curling v. Secretary of Georgia*,
    761 F. App'x 927 (11th Cir. 2019)...................................................................35

*DeKalb Stone, Inc. v. County of DeKalb*,
    106 F.3d 956 (11th Cir. 1997) .........................................................................35

*Ellis v. Coffee County Board of Registrars*,
  981 F.2d 1185 (11th Cir. 1993) ..................................... 35, 40, 41, 42, 43, 44, 45

*Finch v. City of Vernon*,
  877 F.2d 1497 (11th Cir. 1989) ....................................................21, 30

*Fuller v. Carollo*,
  No. 21-11746, 2022 WL 333234 (11th Cir. Feb. 4, 2022)...............19, 34, 35, 38

*Gomez v. City of Miami*,
  No. 23-13364, 2024 WL 4369605 (11th Cir. Oct. 2, 2024) ..............................43

*Hernandez v. City of Lafayette*,
  643 F.2d 1188 (5th Cir. Unit A 1981) ........................................................30, 43

*Hughes v. Tarrant County Texas*,
  948 F.2d 918 (5th Cir. 1991) ...........................................................19, 20, 39, 40

*Israel v. DeSantis*,
  4:19cv576-MW/MAF, 2020 WL 2129450 (N.D. Fla. May 5, 2020)...........30, 39

*Kelly v. Board of Commissioners, Fulton County*,
  2025 WL 2117809 (11th Cir. 2025) ................................................................35

*Kentner v. City of Sanibel*,
  750 F.3d 1274 (11th Cir. 2014) ................................................................35, 36

*Khoury v. Miami-Dade County School Board*,
  4 F.4th 1118 (11th Cir. 2021) ................................................................17

*Lewis v. Brown*,
  409 F.3d 1271 (11th Cir. 2005) ................................................................35

*Littlejohn v. School Board of Leon County, Florida*,
  132 F.4th 1232 (11th Cir. 2025) ................................................................35, 37

*Macuba v. Deboer*,
  193 F.3d 1316 (11th Cir. 1999) ................................................................44

*Mastroianni v. Bowers*,
  173 F.3d 1363 (11th Cir. 1999) ................................................................44

*McGrain v. Daugherty*,
   273 U.S. 135 (1927)........................................................................42

*Parnell v. School Board of Lake County*,
   No. 4:23-cv-414-AW-MAF, 2024 WL 5508347 (N.D. Fla. Sept.
   24, 2024) .......................................................................................27

*PEN American Center, Inc. v. Escambia County School Board*,
   787 F. Supp. 3d 1292 (N.D. Fla. 2024) .....................................13, 29, 32, 40, 43

*PEN American Center, Inc. v. Escambia County School District*,
   No. 24-13896, 2025 WL 1937264 (11th Cir. July 15, 2025) ...........................14

*Scott v. Taylor*,
   405 F.3d 1251 (11th Cir. 2005) .......................................................44

*Smith v. Lomax*,
   45 F.3d 402 (11th Cir. 1995) ...................... 19, 21, 28, 31, 32, 33, 34, 35, 38, 39

*Smith v. Shook*,
   237 F.3d 1322 (11th Cir. 2001) ......................................................44

*Tenney v. Brandhove*,
   341 U.S. 367 (1951)......................................................................42

*United States v. Howard*,
   28 F.4th 180 (11th Cir. 2022) .......................................................10

*Watts v. Joggers Run Property Owners Association, Inc.*,
   133 F.4th 1032 (11th Cir. 2025) ....................................................10

*Woods v. Gamel*,
   132 F.3d 1417 (11th Cir. 1998) ................................... 20, 21, 27, 34, 35, 38, 44

*Yeldell v. Cooper Green Hospital, Inc.*,
   956 F.2d 1056 (11th Cir. 1992) ............................ 18, 20, 21, 23, 31, 32, 33, 39

**Statutes**

28 U.S.C. § 1331 ............................................................................1

**Other Authorities**

Black's Law Dictionary (12th ed. 2024) .............................................37

vi

Fed. R. Civ. P. 37 ...............................................................................12

Fed. R. Civ. P. 72 ...............................................................................12

Wright & Miller, *Federal Practice and Procedure* § 2103 ....................................12

## STATEMENT OF JURISDICTION

The District Court had jurisdiction under 28 U.S.C. § 1331.

Plaintiffs/Appellees take no position as to whether this Court has jurisdiction to hear this interlocutory appeal of a discovery order.

1

## <u>STATEMENT OF THE ISSUES</u>

Did the District Court correctly hold that the legislative privilege does not apply to school board members' decisions to remove specific library books from school libraries based on existing school board policy?

## STATEMENT OF THE CASE

### I.    NATURE OF THE CASE

Plaintiffs-Appellees ("Plaintiffs") are parents of students in the Escambia County School District, book authors, a book publisher, and an organization that represents authors, who challenge the decisions of Defendant Escambia County School Board ("Board") to remove over 100 books and restrict access to others in school libraries. In its ruling denying the Board's Motion to Dismiss, the District Court held that, to prevail on their viewpoint discrimination claim, Plaintiffs must show that the books were removed or restricted "based on ideological objections to the books' content or disagreement with their messages or themes, rather than for pedagogical reasons." D.E. 65 at 7 (cleaned up). In other words, as the Eleventh Circuit has explained in another case challenging library-book removals, "the Board's motive is the ultimate fact upon which the resolution of the constitutional question depends." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1204 (11th Cir. 2009).

Notwithstanding the clear law providing that the Board's motives for the book removals and restrictions are a central issue in the case, the Board has sought to bar Plaintiffs from deposing the Board members about their book removal decisions. In particular, the Board contends that the legislative privilege shields Board members from having to testify about the reasons for their book removal decisions. In a

3

thoughtful Order that is the subject of this appeal, the District Court declined the Board's invitation to overextend the legislative privilege to bar Plaintiffs from deposing the Board members. The District Court correctly held that the Board's decisions to remove specific books from school libraries constituted the application of existing policy to specific facts and thus were administrative acts not covered by the privilege.

The Court should affirm the District Court's decisions. The legislative privilege does not bar the Board member depositions because the actions at issue here—deciding to remove specific books from school libraries based on facts particular to those books in accordance with the school district's policies—were administrative, not legislative, in nature. Accordingly, the legislative privilege does not apply.

## II.    STATEMENT OF THE FACTS

The underlying lawsuit challenges the decisions of the Board in 2023 to remove nine books from Escambia County school libraries (the "Original Removed Books"),[1] and to restrict access to over 100 additional books while the challenges to those books are considered by the school district. *See* D.E. 219 ¶¶ 102, 108; D.E. 27

---

[1] The Original Removed Books are *All Boys Aren't Blue* by George M. Johnson, *And Tango Makes Three* by Peter Parnell & Justin Richardson, *When Aidan Became a Brother* by Kyle Lukoff, *New Kid* by Jerry Craft, *Drama* by Raina Telgemeier, *The Bluest Eye* by Toni Morrison, *The Nowhere Girls* by Amy Reed, *Push* by Sapphire, and *Lucky* by Alice Sebold.

¶ 88. The lawsuit also challenges the decisions of the Board in 2025 to remove 120 books as part of a broad purge from all school libraries, including 16 at-issue books singled out by the Superintendent (the "Superintendent-Removed Books") and 101 at-issue books that had been removed by at least one other Florida school district from some grade levels (the "Mass-Removed Books"). *See* D.E. 219 ¶¶ 34(b), 173; D.E. 219-1, Ex. 12 at 64-71.

The process resulting in the book removals and restrictions began in May 2022, when a single Escambia County school teacher, Vicki Baggett, began a campaign to remove books from school libraries based on ideological objections to their contents. D.E. 219 ¶¶ 41, 45-63; D.E. 219-1, Exs. 13-14, 16, 18, 20, 22, 24 at 73-76, 84-85, 92-93, 103-04, 112-13, 121-22. Hundreds of books were challenged on overtly ideological grounds, with the challenges regularly repeating verbatim the rationale and book excerpts posted on websites affiliated with Moms for Liberty, a politically conservative group focused on combating the alleged "woke" influence in public schools, targeting these same books. *See* D.E. 219 ¶¶ 42, 53-54, 58. The books were challenged, for example, because of their portrayal of LGBTQ characters (*e.g.*, "indoctrination of LGBTQ; age-inappropriate," "gay agenda"), references to racism (*e.g.*, "race-baiting; anti-whiteness; woke agenda," "incite racial division," "controversial racial and social commentary"), and other viewpoints that Ms. Baggett and other challengers found objectionable (*e.g.*, "graphic sexual

content; sexual introductions; sexually excite," "[t]he purpose of fiction writing is simply TO ENTERTAIN. It is not to inform or educate."). *See id.* ¶¶ 108, 139, 155, 157, 164. These books include many classics of American literature, like *Slaughterhouse-Five* by Kurt Vonnegut, *Beloved* by Toni Morrison, and *Forever* by Judy Blume, which have been on school-library shelves for years, if not decades. *Id.* ¶¶ 66, 80.

In 2023, the school district had a policy—"Policy 4.06"—for handling such book challenges. D.E. 219-1, Ex. 1 at 4-18; App. Br. at 7-8 (describing policy). Substantively, Policy 4.06 permitted individuals to challenge material in a school library on the grounds set out in Florida law—that it is "pornographic" or prohibited under Fla. Stat. 847.012, or that it "depicts or describes sexual conduct." D.E. 219-1, Ex. 1 at 15. Materials found to contain depictions or descriptions of sexual conduct would be discontinued "for any grade level or age group for which such use is inappropriate or unsuitable." *Id.* at 1-2. This suggests that such material could be continued for grade levels for which it is appropriate.

Procedurally, Policy 4.06 provided that a book challenge would be considered by a review committee composed of community members, school administrators, teachers, parents/guardians, and media specialists (*i.e.*, school librarians). *Id.* at 13-14. Absent an appeal to the Board, the review committee's decision was final. *Id.* at 14. If the complainant disagreed with the review committee's decision regarding a

particular book, she could appeal to the Board, which would then review all materials presented to the review committee and make its decision. *Id.* at 14-15. Among the materials provided to both the review committees and the Board in this process were the book at issue, as well as professional reviews of the book. *Id.* at 13-14.[2] Policy 4.06 also empowered the Superintendent to determine that a challenge to a title by itself provided sufficient evidence to remove the title without review by the district review committee or the Board. *Id.* at 13.

Each of the nine Original Removed Books was challenged pursuant to Policy 4.06 and ultimately removed by the Board based on a vote of its individual members. D.E. 219 ¶¶ 104-08, 114-40. In each case, the removal decision was contrary to the recommendation of the review committee, which had determined that each of the books has educational or literary value and is suitable for its relevant grade levels. D.E. 219 ¶¶ 98-102, 104-06, 115-40.[3] So, for example, while the Newbery Medal-winning graphic novel *New Kid*, which tells the story of a 12-year-old Black boy who experiences culture shock when he enrolls in a private school, was challenged for "race-baiting" and "anti-whiteness," the district review committee voted overwhelmingly to keep it in all libraries. *Id.* ¶ 127. Nonetheless, the Board

---

[2] *See also* https://tinyurl.com/mpkkwckx (school district website listing challenged books and linking materials provided to review committees and the Board).

[3] Plaintiffs also challenged the Board's practice of restricting student access to over 100 challenged books while the challenges are considered. Many of the books were restricted for over two years. Those restrictions are not at issue in this appeal.

overruled this decision, initially removing the book from elementary school libraries and ultimately from all libraries. *Id.* Likewise, after the celebrated picture book, *And Tango Makes Three*, about two male penguins at the Central Park Zoo who together incubate an egg and raise the resulting baby penguin, was challenged for an "LGBTQ agenda using penguins," the district review committee voted unanimously to keep it in all libraries. *Id.* ¶¶ 115-18. The Board again reversed this decision, voting to remove the book from all school libraries, with one Board member expressing his disapproval of "the fascination . . . that it's two male penguins raising a chick." *Id.*

Apparently dissatisfied with the recommendations of the district review committees, the Board suspended their work for 18 months, even as there were over 100 books awaiting review. *Id.* ¶¶ 159-60. Then in 2024, the Board adopted a new Policy for book challenges—"Policy 2522"—that continued much of Policy 4.06 but reconstituted the district review committees to include a supermajority of School Board appointees. D.E. 219-1, Ex. 11 at 59-63.

On June 16, 2025, the Board discussed doing away with individualized consideration of most book challenges and directing the Superintendent to remove from all Escambia school libraries any book that had been removed for any grade level in any other school district in Florida, as identified on the Florida Department of Education's compilation of such books, in order to speed up the process of

8

removing books to resolve book challenges. D.E. 219 ¶ 172. The Superintendent supported the idea, commenting that using the state list could "prove a buffer from a political standpoint for you as a school board." *Id.*

The next day, on June 17, 2025, the Board adopted this idea and so directed the Superintendent. The Board also approved the Superintendent's separate recommendation to remove 18 books, including 16 books at issue in this lawsuit, *i.e.*, the Superintendent-Removed Books, "pursuant to the authority granted to [the Superintendent] by Board policy 2522" and the alleged descriptions and depictions of sexual conduct contained in the books. D.E. 219 ¶ 173; D.E. 219-1, Ex. 34 at 154-56. The Superintendent-Removed Books included several that had previously been restricted but not removed by the Board.

On July 15, 2025, the Board voted to remove over 400 books from its libraries that were on the Florida Department of Education's book removal list, as identified on a list attached to the resolution, "without further review." D.E. 219-1, Exs. 35-36 at 158-170. This included 101 books at issue in this lawsuit, *i.e.*, the Mass-Removed Books, including many of the previously restricted books, several books that the district review committee process had earlier determined should remain in school libraries, as well as some of the Original Removed Books that the Board had previously removed only for some grade levels. D.E. 219 ¶¶ 34(b), 177. The Mass-Removed Books were removed from all school libraries for all grade levels.

9

A few months later, in October 2025, the Board voted to revise its policy regarding the selection of instructional materials, including the selection of library books—"Policy 2520." In particular, the Board decided that "[b]ooks which have been removed by other school districts shall not be selected [for school libraries] unless specific approval is requested and obtained by the School Board." Policy 2520, amended Oct. 21, 2025.[4]

The book removals by the Board disproportionately affect minority and LGBTQ authors and/or books with themes related to minority and/or LGBTQ identity. D.E. 219 ¶¶ 178-85.

## III.  COURSE OF PROCEEDINGS

Plaintiffs filed an amended complaint in July 2023. D.E. 27. After briefing and argument, the District Court denied the Board's motion to dismiss Plaintiffs' First Amendment claims of viewpoint discrimination and right to receive information, and dismissed Plaintiffs' equal protection claim. D.E. 65 at 6-10.

---

[4] This policy was revised after the District Court's orders under appeal, and therefore does not appear in the District Court record. This Court can take judicial notice of this duly adopted local government action. *Watts v. Joggers Run Prop. Owners Ass'n, Inc.*, 133 F.4th 1032, 1036 n.3 (11th Cir. 2025) ("Courts may take judicial notice of relevant public documents required to be filed that are not subject to reasonable dispute.") (cleaned up); *United States v. Howard*, 28 F.4th 180, 186 n.2 (11th Cir. 2022) ("we can take judicial notice of it as a publicly available state agency record"). The policy is available at https://go.boarddocs.com/fl/escambia/Board.nsf/vpublic?open# by navigating to Policies on the top menu, expanding "2000 Program" on the ensuing page by clicking the "+" symbol, and selecting Policy 2520 from the drop-down list.

In its Order on the Board's motion to dismiss, the District Court described the applicable legal standard for Plaintiffs' First Amendment claims as follows:

> The applicable legal standard for evaluating alleged First Amendment violations in the school library context is not entirely clear but the common theme in all of the potentially relevant standards . . . is that school officials cannot remove books solely because they disagree with the views expressed in the books but that they can make content-based removal decisions based on legitimate pedagogical concerns including things like pornographic or sexual content, vulgar or offensive language, gross factual inaccuracies, and educational unsuitability for certain grade levels.

*Id.* at 7. The Court ruled that the amended complaint plausibly alleged that the Board had removed and restricted library books "based on ideological objections to the books' content or disagreement with their messages or themes, rather than for pedagogical reasons," and that Plaintiffs could proceed to discovery. *Id.* at 7-8.

On May 31, 2024, Plaintiffs served notices of deposition for each of the then-Board members who had voted to remove the Original Removed Books ("the original Board members"). D.E. 82-1. Plaintiffs sought to depose the original Board members regarding the motivations behind their individual decisions to vote to remove the Original Removed Books against the recommendation of the review committees.

The Board moved for a protective order to prevent the depositions on multiple grounds, including legislative privilege. D.E. 82. The Board's motion was referred to a Magistrate Judge, who after noting that "the motivations of the individual Board

11

members are relevant," denied the motion without prejudice because "the legislative privilege is personal to the legislator" and the Board's motion failed to indicate that the individual Board members wished to invoke the privilege. D.E. 98 at 4, 6-7.

The Board filed a renewed motion for a protective order, attaching a short declaration from each of the original Board members stating that "to the extent the legislative privilege is applicable to me and may be invoked by me, I confirm my intent to assert the privilege here." D.E. 107–107-5. The Board members did not otherwise appear or participate in the motion. Plaintiffs opposed the renewed motion. D.E. 113.[5]

The Magistrate Judge held oral argument on the Board's renewed motion. D.E. 115. The individual Board members did not participate in the argument. The Magistrate Judge granted the Board's motion on grounds that the legislative privilege applied. D.E. 138. Plaintiffs filed objections to the Magistrate Judge's order with the District Court pursuant to Fed. R. Civ. P. 72(a), D.E. 143, and the Board responded, D.E. 151.

---

[5] In an abundance of caution, Plaintiffs also served amended notices of depositions and subpoenas for testimony on the Board. As the Board members are effectively the Board's officers, directors or managing agents, the deposition notices served upon the Board were sufficient and no subpoenas were necessary. *See, e.g.*, *Brunson v. PHH Mortgage Corp.*, 342 F.R.D. 315, 320 (M.D. Fla. 2022) ("a corporation is responsible for producing its officers, managing agents, and directors if notice is given; a subpoena for their attendance is unnecessary, and sanctions may be imposed against the corporation if they fail to appear" (internal marks omitted)); Wright & Miller, *Federal Practice and Procedure* § 2103 (same); Fed. R. Civ. P. 37(b)(2)(A).

The District Court held oral argument on Plaintiffs' objections, at which the Board members neither appeared nor participated. D.E. 152. At the conclusion of the argument, the District Court explained on the record its reasoning that legislative privilege did not apply to the Board's votes to remove specific books from school libraries because such votes were administrative acts, and stated that it would permit the depositions of the original Board members to move forward. D.E. 156 at 133-36. In light of the Board's stated intent to appeal, the District Court entered an Order memorializing this ruling, D.E. 153, and two days later, it entered an Amended Order, D.E. 155. That decision is reported at *PEN American Center, Inc. v. Escambia County School Board*, 787 F. Supp. 3d 1292 (N.D. Fla. 2024) and is referred to herein, in conformity with Appellants' form of citations, as *PEN II*.

The Amended Order set forth the applicable legal standard from *Crymes v. DeKalb County, Ga.*, 923 F.2d 1482 (11th Cir. 1991), and *Brown v. Crawford County*, 960 F.2d 1002 (11th Cir. 1992), and explained that under that standard the decisions to remove the books were administrative: "The removal/restriction decision is based on specific facts (the content of the book), and … involves the case-by-case *application* of the standards in state law and school board policy to a specific book, not the *formulation* of general standards that apply to all books." *PEN II*, 787 F. Supp. 3d at 1297 (D.E. 155 at 5-6).

The Board and the individual Board members then appealed the Amended

13

Order to this Court, and the District Court stayed all proceedings pending resolution of that appeal. D.E. 170.

After briefing, this Court withdrew the appeal from the oral argument calendar and dismissed the appeal for lack of jurisdiction. *PEN American Center, Inc. v. Escambia Cty. Sch. Dist.*, No. 24-13896, 2025 WL 1937264 (11th Cir. July 15, 2025). In a per curiam opinion, this Court held that the Board itself lacked standing to appeal because it lacked standing to assert the legislative privilege of its members. *Id.* at *4. The Court also ruled that the original Board members, who were appellants in that appeal, lacked standing to appeal because they had not participated in the proceedings below. *Id.*

On remand, Plaintiffs pressed forward with litigating their claims, including seeking to amend their complaint and seeking the depositions of the Board members that the District Court had authorized. Plaintiffs sought leave to file a Second Amended Complaint in light of the School Board's recent actions to remove hundreds of books from school libraries, including the Superintendent-Removed Books and the Mass-Removed Books. D.E. 204. The District Court granted the motion, D.E. 217, and the Second Amended Complaint is now the operative complaint. D.E. 219; D.E. 219-1. Among other new allegations, the Second Amended Complaint challenged the Board's more recent book removals and added a First Amendment claim based on the Board's effective delegation, with unbridled

14

discretion, of its determinations about the appropriateness of books in its libraries to an aggregated list of removals from other school districts in Florida.  D.E. 219 ¶¶ 158-77, 244-48.

Over Plaintiffs' objections, D.E. 197 at 5-10; D.E. 207 at 17-25, the District Court allowed the original Board members—whose depositions had been noticed in May of 2024 but who had never participated in the District Court proceedings—to challenge the original deposition notices and subpoenas nearly 15 months after those notices were served. D.E. 200 at 2. Each of the original Board members—Appellants Adams, Fetsko, Hightower, Slayton, and Williams—then filed a separate Motion to Quash Subpoena and Motion for Protective Order. D.E. 210, 212-15.[6]

Plaintiffs opposed the motions on the grounds that they were untimely and because the legislative privilege does not apply. D.E. 225. The District Court determined the motions to be timely, but denied them on the merits for "the reasons stated" in *PEN II*. D.E. 226 at 1-2. The original Board members promptly appealed to this Court. *PEN American Ctr., Inc. v. Adams ("Adams")*, No. 25-13298-E.

Because resolution of the underlying case was going to be delayed due to the original Board members' interlocutory appeal, and given the newly constituted

---

[6] Appellants' statements that Plaintiffs served new subpoenas on the original Board members is incorrect. App. Br. at 5, 10. Plaintiffs did not serve any new deposition notices or subpoenas on the Board or the original Board members, as the outstanding deposition notices were still valid. *See* D.E. 207 at 14; D.E. 210, 212-214 at 2 (in each case referencing original deposition notices and protective subpoenas).

Board's then-recent actions to remove the Superintendent-Removed Books and Mass-Removed Books from all Escambia public school libraries, Plaintiffs served deposition notices for the depositions of the two newly elected Board members who (along with three of the original Board members) participated in the votes to remove the Superintendent-Removed Books and Mass-Removed Books (the "new Board members"). D.E. 234-2, 235-2; *see also* D.E. 244 at 4-5. The new Board members are Appellants Bergosh and Harrell. At defense counsel's insistence, Plaintiffs also served protective subpoenas on Bergosh and Harrell, while maintaining Plaintiffs' position that the deposition notices were sufficient to compel their testimony. D.E. 234-3, 235-3; *see also* D.E. 244 at 5.

Bergosh and Harrell each moved for a protective order and to quash the subpoenas based on legislative privilege and other grounds, D.E. 234, 235, and Plaintiffs opposed the motions, D.E. 244. The District Court denied the motions with respect to the legislative privilege for "the reasons stated" in *PEN II*. D.E. 246 at 2. Appellants Bergosh and Harrell promptly appealed, *PEN American Ctr. Inc. v. Bergosh ("Bergosh")*, No. 25-13698-E, and their appeal was consolidated with the original Board members' appeal on Plaintiffs' motion, *Adams*, Doc. No. 24-2 at 3; *Bergosh*, Doc. No. 22-1 at 3. This Court also granted Plaintiffs' motion to expedite the appeals, directing that the appeals be expedited as to briefing, disposition, and oral argument. *Adams*, Doc. No. 24-2 at 3; *Bergosh*, Doc. No. 22-1 at 3.

## IV.    STANDARD OF REVIEW

This Court reviews a "District Court's ruling on discovery matters only for abuse of discretion." *Khoury v. Miami-Dade Cnty. Sch. Bd.*, 4 F.4th 1118, 1125 (11th Cir. 2021). Under that standard, the Court "will leave the district court's ruling on the motion undisturbed unless the district court has made a clear error of judgment, or has applied the wrong legal standard." *Id.*

## SUMMARY OF THE ARGUMENT

This Court should affirm the District Court's Order holding that the Board's decisions to remove particular books from school libraries are administrative and thus not protected by legislative privilege.

Only legislative functions are protected by legislative privilege. Legislative functions include the making of policy of general application and the conduct of investigations. Administrative acts, by contrast, are those based on and applicable to specific facts, including those that apply existing policies to a specific set of facts. In each decision removing specific books from Escambia school libraries, the Board members applied the Board's existing policies to specific sets of facts—the content or status of each challenged book—which is quintessentially an administrative act. The Board's book removal decisions created no policy of general application that could be applied to future book removals. Appellants' arguments to the contrary fail to provide an analytic framework by which to distinguish between legislative and

17

administrative acts; instead, Appellants point to a handful of circumstantial factors (such as voting or getting public input) in a futile effort to cobble together support for their position. But the factors identified by Appellants do not serve to distinguish legislative from administrative acts and cannot overcome the simple fact that the Board's decisions are not generally applicable policy but instead fact-specific determinations applicable only to the books at issue.

For these reasons and the reasons set forth below, the Court should affirm the District Court's Orders denying Appellants' motions for protective orders.

## **ARGUMENT**

**I.     The District Court Correctly Held that the Board's Decisions to Remove Specific Books from School Libraries Were Administrative.**

**A.     The Applicable Legal Standard Focuses on Whether an Act Is Policymaking (Legislative) or Applying an Existing Policy (Administrative).**

The District Court correctly concluded the Board's decisions to remove specific books from school libraries pursuant to the Board's policies were administrative—not legislative—acts. It is undisputed that "it is the nature of the act"—and not the title of a particular individual—"which determines whether legislative immunity shields the individual from suit." *Yeldell v. Cooper Green Hosp., Inc.*, 956 F.2d 1056, 1062 (11th Cir. 1992).[7] That is, although school board

---

[7] "Legislative immunity and privilege are parallel concepts, and the privilege exists to safeguard the immunity." *Common Cause Fla. v. Byrd*, 674 F. Supp. 3d 1097,

members may be entitled to legislative immunity and privilege when acting in a legislative capacity, their status as local government officials does not cloak all their actions with such protections. Instead, the court must consider "the nature of the act" at issue—in this case, a series of decisions to apply the Board's existing policies to specific challenged books. Put another way, "[a]bsolute legislative immunity extends only to actions taken within the sphere of legitimate legislative activity." *Corn v. City of Lauderdale Lakes*, 997 F.2d 1369, 1392 (11th Cir. 1992) (internal marks omitted).

This Court has long held that "[a] legislative act involves *policy-making* rather than mere administrative application of existing policies." *Crymes*, 923 F.2d at 1485 (emphasis added); *Smith v. Lomax*, 45 F.3d 402, 405 (11th Cir. 1995) (same); *Fuller v. Carollo*, No. 21-11746, 2022 WL 333234, at *3 (11th Cir. Feb. 4, 2022) (same).

As the court explained in *Crymes,* in identifying factors that might point to whether a decision is "policymaking," "[i]f the facts utilized in making a decision are specific, rather than general, in nature," or "the decision impacts specific individuals, rather than the general population," the decision is more likely to be administrative. *Crymes*, 923 F.2d at 1485; *Smith*, 45 F.3d at 406. *See also Hughes v. Tarrant Cnty. Texas*, 948 F.2d 918, 921 (5th Cir. 1991) ("If the underlying facts on

---

1103 n.2 (N.D. Fla. 2023) (cleaned up; citing cases). Accordingly, like Appellants, Plaintiffs cite to cases discussing both legislative privilege and legislative immunity.

which the decision is based are 'legislative facts,' such as 'generalizations concerning a policy or state of affairs,' then the decision is legislative. If the facts used in the decisionmaking are more specific, such as those that relate to particular individuals *or situations*, then the decision is administrative." (emphasis added) (cleaned up)).

But these factors are just guideposts. The underlying standard to be applied is that "a legislative act is characterized by having a *policymaking* function *and general application*." *Brown*, 960 F.2d at 1011 (emphasis added); *see also Woods v. Gamel*, 132 F.3d 1417, 1420 (11th Cir. 1998) (same); *Hughes*, 948 F.2d at 921 ("If the action involves *establishment of a general policy*, it is legislative; if the action singles out specific individuals and affects them differently from others, it is administrative." (emphasis added) (cleaned up)). As this Court clarified, "[g]enerally, absolute immunity applies to prospective, legislative-type rules that have general application." *Bryant v. Jones*, 575 F.3d 1281, 1306 (11th Cir. 2009) (cleaned up). *See also Yeldell*, 956 F.2d at 1063 ("policy-making power" is "the cornerstone of legislative activity").

This framework elucidates many of this Court's opinions. For example, adopting a generally applicable rule regarding building or a zoning ordinance is legislative because it makes a policy that can be generally applied prospectively. *Brown*, 960 F.2d at 1012 (adoption of "moratorium of general application on issuing

20

mobile home permits" was legislative); *Corn*, 997 F.2d at 1371, 1392 (11th Cir. 1993) (adoption of ordinances eliminating mini-warehouses as permitted use and changing zoning applicable to a property were legislative). But granting or denying a zoning permit is administrative because it constitutes application of a general rule to a specific set of facts. *Crymes*, 923 F.2d at 1482 (vote to deny development permit for specific property was administrative); *Corn*, 997 F.2d at 1371, 1393 (vote to deny development permit was administrative). Similarly, adopting a budget that eliminates a department is legislative because it makes policy about how to expend limited resources that will be applied prospectively. *Bryant*, 575 F.3d at 1306-07 (adoption of budget that eliminated plaintiff's position was legislative); *Woods*, 132 F.3d at 1420 (adoption of budget impacting county jail was legislative); *Finch v. City of Vernon*, 877 F.2d 1497,1500, 1505 (11th Cir. 1989) (decision to abolish police department, of which plaintiff was only employee, was legislative); *see also Bogan v. Scott-Harris*, 523 U.S. 44, 56 (1998) ("termination of a position, which, unlike the hiring or firing of a particular employee, may have prospective applications that reach well beyond the particular occupant of the office" is legislative). But deciding to terminate or not hire a particular individual is administrative, because it constitutes the application of existing policy—the decision to have a position filled by someone—to a specific applicant or employee. *Smith*, 45 F.3d at 406 (vote to not re-appoint county clerk was administrative); *Yeldell*, 956

21

F.2d at 1062-63 (personnel decisions regarding specific individuals were administrative).

The handful of this Court's cases that involve both legislative and administrative decisions are instructive of the distinction. In *Corn*, for example, the court held that council members were immune from claims relating to their votes in support of two ordinances that "eliminated mini-warehouses as a permitted use within the relevant zoning classification" and "changed the zoning on the property [at issue in the lawsuit] to a more restrictive business classification" because those votes were legislative. 997 F.2d at 1371, 1392. But at the same time, *Corn* held that the council members' votes to "deny[] approval of Corn's site plan" were administrative. *Id.* at 1393. The rationale for these holdings was that adoption of the ordinances was adoption of a policy of general applicability, whereas denial of the site plan constituted "application of policy to a specific party." *Id.* (quoting *Crymes*, 923 F.2d at 1486).

In *Crymes*, the court held that the "decision to deny Crymes' application [for a development permit] is the application of policy to a specific party" and therefore not legislative. 923 F.2d at 1486. The court also noted in *dicta* that a separate decision by the defendant Board of Commissioners to remove a certain road from the county's list of truck routes was "probably legislative." *Id.* at 1485. Appellants misconstrue this statement, arguing that *Crymes* "found legislative privilege in

22

actions that did not result in the explicit creation of policy." App. Br. at 18. Setting aside that *Crymes* did not "find legislative privilege" with respect to the truck route decision, which was not at issue in the case, the reason that the removal of the truck route would have appropriately been viewed as legislative is because it was effectuated through an amendment of the country code, a quintessentially legislative function. *Crymes*, 923 F.2d at 1484. Moreover, the designation of a route as a truck route *was* a policy of general applicability as it would apply to future zoning decisions where availability of a truck route was relevant. *See id.* at 1484-85 (describing relevance of truck routes generally to Crymes' application and noting that removal of truck route did not apply to Cryme's application but was prospective only). *See also Yeldell*, 956 F.2d at 1063 (individual Commissioner's personnel decisions were administrative; other Commissioners' failure to introduce legislation re-allocating legislative responsibilities was legislative).

### B. The Decisions to Remove Specific Books from School Libraries Were Administrative.

Applying the above standard to the Board's book removal decisions shows those decisions were administrative.

Start with the decisions to remove the nine Original Removed Books. As explained above, the Board voted to remove each of those challenged books after a review committee established pursuant to the Board's then-applicable policy (Policy 4.06) had recommended retaining the books. As the Board itself admitted in its prior

23

appeal, those decisions were "[d]ecisions by the Board *made under* [Policy 4.06]." Board Br. at 6, *PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, No. 24-13896 (Doc. 23) (emphasis added). Appellants (represented by the same counsel as the Board) have avoided that formulation in their own briefs, apparently realizing that such verbiage is unhelpful to their cause. But they still discuss what the "Board's policies … require" and admit that the Board's actions (with respect to the Original Removed Books and otherwise) were "undertake[n] pursuant to" the Board's policies, App. Br. at 16, and that the Board's decisions were based on "whether the challenged material meets the requirements of the Board's policy," *id.* at 8. That is, in the words of *Crymes*, *Smith*, and *Fuller*, the Board's actions with respect to the Original Removed Books constituted the "application of existing policies" (Policy 4.06) to a specific set of facts (the content of the specific books at issue).

Policy 4.06 itself provided that "[c]hallenged materials may be removed from use only after" completing certain procedures. D.E. 27 Ex. 1 at 11. The Board previously (accurately) described how it "implement[ed] and effectuat[ed]" the policy through the votes on the Original Removed Books, Board Br. at 41, with each Board member voting based on how the factors from the Policy applied to each book, *id.* at 42. In the Board's own words, "*the [Board's decisions] resulted from the application of a generally applicable [policy]*" to "*individual books.*" *Id.* at 50 (brackets in original; emphasis added). That alone should be dispositive.

24

So too with respect to the Superintendent-Removed Books. *See* D.E. 219 ¶¶ 34(b)(ii), 173. By the time the Board voted to remove those books from school libraries, Policy 4.06 had been replaced by Policy 2522. *Id.* ¶ 158; D.E. 219-1, Ex. 11 at 59-63; App. Br. at 7. That policy provided that the "Superintendent … shall retain the right to make a determination that the challenge to a title on the basis that is contains content that is pornographic or prohibited under F.S. 847.012 or describes sexual conduct as defined [in Florida law] provides sufficient evidence to remove the title…." D.E. 219-1, Ex. 11 at 61. Here, the Superintendent chose instead to make a recommendation to the Board to remove the books at issue on those grounds. And indeed, the recommendation from the Superintendent makes clear that his recommendation is "[p]ursuant to the authority granted to me by Board policy 2522." *Id.*, Ex. 34 at 155. The Board's vote to remove the Superintendent-Removed Books, like the vote to remove the Original Removed Books, thus reflected the application of existing policy (Policy 2522) to specific facts (the books the superintendent recommended be removed). Or, in Appellants' own words, the vote was "undertake[n] pursuant to" the Board's policies, App. Br. at 16, and reflected the Board's decision as to "whether the challenged material meets the requirements of the Board's policy," *id.* at 8.

Finally, the Board's decision to remove all books that had been removed from any grades in any other Florida school district (the Mass-Removed Books), *see* D.E.

25

219 ¶¶ 34(b)(iii), 174-77; D.E. 219-1, Exs. 35-36 at 158-70, was similarly an administrative act, applying Board policy to a specific set of identified books. On July 15, 2025, the Board decided to remove specifically identified books—"the titles listed"—from all school libraries "in compliance with the School Board Directive approved on June 17, 2025, to remove the books listed by the Florida Department of Education's book removal list, without further review." D.E. 219-1, Ex. 36 at 158. That is, the Board applied a previously-adopted directive—that all books removed elsewhere be removed in Escambia—to an identified list of books appended to the Board's July 15 decision to remove the Mass-Removed Books.

That decision, to remove specific books previously removed by other school districts in Florida, contrasts with the Board's later decision, in October 2025, to adopt a generally applicable policy that *in the future* "[b]ooks which have been removed by other school districts shall not be selected [for school libraries] unless specific approval is requested and obtained by the School Board." Policy 2520, amended Oct. 21, 2025.[8] That latter decision was legislative, adopting a generally applicable rule (books removed in other districts should not be selected) that applies prospectively to any books. But the decision to remove the specified Mass-Removed Books that had been removed from other districts, like the decisions to remove the specific Original Removed Books and the Superintendent-Removed Books,

---

[8] *See supra* at 10 & n.4 (describing Policy 2520 and how to access it).

constituted an "application of policy" (the Board's June 17, 2025 Directive) to a "specific" set of facts (the "titles listed" appended to the Board's action). *See Corn*, 997 F.2d at 1392 ("application of policy to a specific party" is administrative).[9]

In all cases, the Board's votes to remove specific books were not "policymaking and of general application," *Woods*, 132 F.3d at 1420; *Brown*, 960 F.2d at 1011, and they most certainly did not establish "prospective, legislative-type rules that have general application." *Bryant*, 575 F.3d at 1306. *They provided no criteria or rule of decision to apply in the future to other challenged books*.

Notably, Appellants, like the Board before them, fail to identify any policy of general application that resulted from the votes. The Board did not adopt a rule of decision that could be applied prospectively to other books in the future; it made a decision that certain specified books should be removed from school libraries. Appellants' statement that the "Board members' decisions resulted in generally applicable policy," App. Br. at 33-34, rings hollow, given their failure to explain

---

[9] For a similar reason, Appellants' reliance on the decision in *Parnell* is misplaced. Appellants quote that decision for the proposition that the "Board voted ... about *what types* of books should be available to public school children." App. Br. at 30 (quoting *Parnell v. Sch. Bd. of Lake Cnty.*, No. 4:23-cv-414-AW-MAF, 2024 WL 5508347, at *2 (N.D. Fla. Sept. 24, 2024)) (emphasis added). But that is manifestly *not* what the Board voted on when it voted to remove specific books from school libraries—it voted about *which specific* books should be available. By contrast, when the Board voted to amend Policy 2520 to provide that books that have been removed elsewhere should not be obtained it was voting about "what types of books" should be available in the future (those not removed elsewhere).

what that generally applicable policy is. And the statement that the "Board established a 'standard course of action' with respect to how *these books* are to be regulated," App. Br. at 34 (emphasis added), is simply false. The Board's decisions did not establish a "standard course of action" to be applied in the future based on generally applicable principles; they made decisions based on specific facts regarding "these books" and "these books" only. The Board's adoption and amendment of Policy 4.06, Policy 2522 and Policy 2520 constituted legislative action. Its decisions to remove certain specified books from school libraries did not.

The factors identified in *Crymes* further support this conclusion. "[T]he facts utilized in making [the Board's] decision[s] [were] specific, rather than general, in nature," and the "decision[s] impact[ed] specific [books]." *Crymes*, 923 F.2d at 1485; *Smith*, 45 F.3d at 406. As Appellants explain, the Board was "required to consider any evidence submitted" for its consideration regarding the books at issue, App. Br. at 8, a classic example of "specific facts." And the decisions only applied to specific books the Board was considering.[10]

---

[10] Under Policy 4.06 and Policy 2522 at the time of the Board's actions at issue here, book challenges were first routed to a review committee to decide whether the book should be removed from some or all grades. D.E. 219-1, Ex. 1 at 16-18 (Policy 4.06); *id.*, Ex. 35 at 61-62 (Policy 2522). If there was no appeal of the committee's decision, it was final. It is only if the book challenger appealed that the Board got involved. The Board does not explain, where there was no appeal, how it could delegate its allegedly legislative function to the review committee, or, alternatively, how it could be that the committee's actions were administrative but the Board's were not.

The District Court was correct in concluding that "[t]he removal/restriction decision is based on specific facts (the content of the book), and it is more akin to a permitting or employment termination decision (which have been held to be administrative acts) than a rezoning or budgeting decision (which have been held to be legislative acts) because the removal/restriction decision involves the case-by-case *application* of the standards in state law and school board policy to a specific book, not the *formulation* of general standards that apply to all books." *Pen II*, 787 F. Supp. 3d at 1297 (D.E. 155 at 6) (italics in original); D.E. 226 at 2 (adopting prior reasons); D.E. 246 at 2 (same). The District Court should be affirmed.

### C.    Appellants' Arguments to the Contrary Are Unavailing.

### 1.    Appellants' "Totality" of Factors Argument Fails

Appellants' attempts to avoid these conclusions are poorly reasoned and incorrect. They do not explain how their decisions constituted policymaking, what policy they made, or how those policies have general application in the future. Nor do Appellants set forth any alternative legal framework to apply. Instead, they argue that "viewing the Board's actions in their totality" demonstrates that they were legislative acts based on a hodgepodge of factors. App. Br. at 24; *see generally id.* at 13-24. But the factors Appellants identify are not dispositive and do not demonstrate that the Board's decisions were anything but administrative.

Furtherance of Duties. The fact that the Board's actions were allegedly taken

29

in furtherance of their duties under Florida law, App. Br. at 15, 17-18, 20, is irrelevant. Appellants principally rely on *Hernandez v. City of Lafayette*, 643 F.2d 1188, 1193 (5th Cir. Unit A 1981), for this contention but ignore the fact that the court there did not hold that any action taken "in furtherance" of a local official's duties is a legislative act. Rather, the quoted statement in Appellants' Brief relates to *Hernandez*'s holding that legislative immunity applies to local officials, not to the scope of that immunity. The *Hernandez* court went on to state: "[h]aving decided that local legislators are entitled to absolute immunity … for conduct *while acting in a legislative capacity*, we now turn to the specific question raised here"—whether a mayor's veto constitutes a legislative act. *Hernandez*, 643 F.2d at 1193 (emphasis added). Even the language quoted by Appellants is limited to conduct in furtherance of "*legislative* duties" specifically. App. Br. at 17 (quoting *Hernandez*, 643 F.2d at 1192) (emphasis added).[11] Similarly, *Finch*, upon which Appellants also rely, App. Br. at 17, makes clear that "immunity extends only to actions taken within the sphere of legitimate legislative activity." 877 F.2d at 1505.

Nor would Appellants' proposed test make any sense, as such an approach would cloak all but illegitimate conduct with immunity. *See Israel v. DeSantis*, 4:19cv576-MW/MAF, 2020 WL 2129450, at *8 (N.D. Fla. May 5, 2020) ("it is not

---

[11] Appellants' Brief cites to page 1193 of *Hernandez*, but the quoted text appears on page 1192.

sufficient to confer legislative immunity that the act in question be one the legislature is constitutionally empowered to undertake, or legislatures would be immune from any lawsuit other than a quo warranto-style challenge to an obviously illegal act"). Many of this Court's cases holding certain acts to be administrative involved conduct in furtherance of duty. *See, e.g.*, *Smith*, 45 F.3d at 406 (decision not to reappoint clerk); *Corn*, 997 F.2d at 1393 (denying approval of site plan); *Yeldell*, 956 F.2d at 1062-62 (hiring and firing decisions); *Crymes*, 923 F.2d at 1486 (vote to deny development permit).[12]

Discretion. That the Board members "were not bound in how they individually were required to vote," App. Br. at 18, is likewise irrelevant. Indeed, it would be odd and meaningless to conduct a vote where the voters were "required to vote" in a particular way. More fundamentally, Appellants fail to offer any support for the notion that exercising discretion is a meaningful marker of legislative as opposed to administrative action. *Bogan*, on which the Board relies, *id.* at 19, refers to a "discretionary, *policymaking* decision" in discussing what constitutes a

---

[12] Appellants' citation to *Bogan*, 523 U.S. at 45, in support of the notion that because the Board's actions were allegedly "part of the Board's statutorily-required 'services to constituents,'" they were legislative, App. Br. at 20, is equally unavailing, as the language that Appellants quote is from the Syllabus to the opinion, which is prepared by the Reporter of Decisions and "constitutes no part of the opinion of the Court." *Bogan*, 523 U.S. at 44 n.*. *See also* App. Br. at 14 (mis-quoting *Bogan*). Although *Bogan* references constituent services in the opinion itself, it makes clear that the key factor in the Court's decision was that it involved "budgetary priorities" and was therefore a "policymaking decision." *Bogan*, 523 U.S. at 55-56.

legislative act. 523 U.S. at 55 (emphasis added). It does not suggest, let alone hold, that exercise of discretion is a distinct marker of legislative action.

Nor could that be the test—or even a helpful factor to consider—as numerous acts that this Court has found to be administrative likewise require an exercise of discretion. *Smith*, 45 F.3d at 406 (decision not to reappoint clerk); *Corn*, 997 F.2d at 1393 (denying approval of site plan); *Yeldell*, 956 F.2d at 1062-63 (hiring and firing decisions); *Crymes*, 923 F.2d at 1486 (vote to deny development permit).

Line-Drawing. Appellants argue that their votes "embodied" their "legislative expressions by weighing various priorities" and consisted of "line-drawing." App. Br. at 20. But a mere weighing of priorities does not render a decision legislative or "policymaking." As the District Court correctly noted, "[t]he fact that school board members must exercise discretion, engage in 'line-drawing,' and make 'policy judgments' when deciding whether a particular book is educationally suitable, grade-level appropriate, etc. does not change the fact that they are applying policy, not formulating it, when doing so." *Pen II*, 787 F. Supp. 3d at 1297 (D.E. 155 at 6). Appellants' reliance on the District Court's reference to "line-drawing," because that phrase was used in *Yeldell*, places undue weight on those two words. App. Br. at 20-21. As discussed above, *Yeldell* drew a clear distinction between administrative acts (personnel decisions regarding specific individuals) and legislative acts (introducing a resolution to redistribute the Commissioner's assignments). Its use of the

32

undefined term "line-drawing" in attempting to distinguish the two does not negate its core holding—that "policy-making power" is the "cornerstone of legislative activity." *Yeldell*, 956 F.2d at 1063.

Voting (and Public Input). Appellants also place heavy emphasis on the fact that they voted to remove the books, allegedly after receiving public input, as if a vote has the talismanic effect of rendering a decision legislative. App. Br. at 17-18, 21-24. But this Court has "expressly rejected the argument that the act of voting, in itself, constitutes legislative action giving rise to immunity." *Smith*, 45 F.3d at 406.[13]

Factor-Weighing and Presumptions. Appellants assert that the District Court erred because it placed greater weight on the ultimate legal question—was the Board engaged in policymaking—than on any of the individual factors that Appellants highlight, and that the District Court somehow "inverted this Court's precedent" by requiring Appellants to prove their acts were legislative when the "presumption is actually the opposite" and Appellants' actions "should be considered legislative by default." App. Br. at 21-24. The problem with this argument is that it is not grounded in precedent.

This Court has laid out a test for distinguishing legislative acts from administrative acts: are the acts policymaking of general application or the "mere

---

[13] Appellants' repeated assertions that these votes took place after public input on the books in question, App. Br. at 7, 16, 21-22, 24, 26-27, is incorrect with respect to the Superintendent-Removed Books and the Mass-Removed Books.

33

administrative application of existing policies." *Crymes*, 923 F.2d at 1485 (emphasis added); *see also Smith*, 45 F.3d at 405 (same); *Fuller*, 2022 WL 333234, at *3; *Brown*, 960 F.2d at 1011; *Woods*, 132 F.3d at 1420. The various factors Appellants emphasize are at best guideposts to help make that ultimate decision or else simply phrases Appellants have pulled from the caselaw untethered from context and purpose. Appellants cite no case supporting the notion—and this Court has never held—that the proper method for determining whether an act is legislative or administrative in nature is viewing "actions in their totality" and tallying sundry factors.

Nor have Appellants provided any support for the notion that their actions "should be considered legislative by default." To the contrary, Appellants themselves recognize "Board members sometimes act in a legislative capacity, and sometimes in an executive/administrative capacity." App. Br. at 26. There is no presumption of legislative activity that attaches to their actions.

Fundamentally, the Board misapprehends the applicable law. The point is not to count how many of *Crymes'* "factors" favor one outcome or another. App. Br. at 21-22. Rather, the question is which part of the applicable legal standard applies— is the act one of policy*making* or application of an existing policy? Here, the Board's decisions to remove specific books from school libraries reflect the application of policy, and not the making of policy.

### 2.    *Crymes* Supports the District Court's Orders.

Apparently recognizing that the test set forth in *Crymes* and later cases is fatal to their position, Appellants first seek to minimize its importance. App. Br. at 25-26 (arguing that *Crymes* does not set the standard "by which all legislative actions must be measured" and is "not the dispositive test the district court made it out to be."). But *Crymes* is perfectly good law that is binding on this Court. Moreover, it has been cited 19 times in other Eleventh Circuit cases, with *12* of those citations involving the question of whether governmental conduct was a legislative act. *See Littlejohn v. Sch. Bd. of Leon Cnty., Fla.*, 132 F.4th 1232, 1242 (11th Cir. 2025); *Kelly v. Bd. of Comm'ners, Fulton Cnty.*, 2025 WL 2117809, at \*2 (11th Cir. 2025); *Fuller*, 2022 WL 333234, at \*3; *Curling v. Sec'y of Ga.*, 761 F. App'x 927, 934 (11th Cir. 2019); *Kentner v. City of Sanibel*, 750 F.3d 1274, 1280 (11th Cir. 2014); *Lewis v. Brown*, 409 F.3d 1271, 1274 (11th Cir. 2005); *Woods*, 132 F.3d at 1420; *DeKalb Stone, Inc. v. Cnty. of DeKalb*, 106 F.3d 956, 959 (11th Cir. 1997); *Smith*, 45 F.3d at 406; *Corn*, 997 F.2d at 1392; *Brown*, 960 F.2d at 1011; *Ellis v. Coffee Cnty. Bd. of Registrars*, 981 F.2d 1185, 1190 (11th Cir. 1993). That certainly sounds like a dispositive test.

Appellants' citation to *Kentner*, 750 F.3d at 1280, and *75 Acres, LLC v. Miami-Dade County*, 338 F.3d 1288, 1297 (11th Cir. 2003), App. Br. at 26, for the proposition that this circuit has not articulated a test for distinguishing legislative from administrative actions is misplaced. Those cases addressed the question of

35

whether an act was legislative, on the hand, or executive or adjudicative, on the other hand, for purposes of *due process* claims; they did not address the question at issue here—whether an act is legislative or administrative for determination of immunity or privilege. *Kentner*, 750 F.3d at 1279-80; *75 Acres*, 338 F.3d at 1293. *Crymes* remains good and binding law.

Appellants fare no better on the merits. First, Appellants repeat their unconvincing arguments about discretion and line-drawing, App. Br. at 27-28, addressed above, *see supra* at 31-33. Next, Appellants seek to conflate the term "administrative" (used in *Crymes* to refer to "administrative application of existing policies") with the term "ministerial," App. Br. at 28-29, in an effort to bolster their argument that the exercise of discretion is relevant. They seek to do so through sleight-of-hand: because another case referred to "ministerial *or* administrative activities" (emphasis added) in identifying "executive" acts for purposes of due process claims, Appellants conclude that the two terms are synonymous, going so far as to apply the definition of "ministerial act" to the term "administrative." App. Br. at 28 (first quoting *Littlejohn*, 132 F.4th at 1242, and then Black's Law Dictionary's definition of "ministerial act" as the definition of "an administrative or 'ministerial'" act).[14]

---

[14] *Littlejohn*, like *Kentner* and *75 Acres*, was a case distinguishing between legislative and executive acts for purposes of a due process claim, not a case distinguishing between legislative and administrative acts for purposes of legislative

But "administrative" and "ministerial" are not synonyms (and *Littlejohn*'s reference to the two terms in the disjunctive does not suggest they are). "Administrative" is defined to mean "of, relating to, or involving the work of managing a company or organization; executive," and, more to the point, "administrative action" is defined to mean "a decision or an implementation relating to the government's executive function or a business's management." Black's Law Dictionary (12th ed. 2024). Neither definition suggests that administrative actions cannot involve discretion. So *Crymes'* reference to the "administrative application of existing policies" comfortably includes the application of such policies even when discretion is involved, which it often is.[15]

Appellants' reference to "broad-ranging regulations" and "rulemaking", App. Br. at 29-30, is puzzling, as there is no contention—nor could there be—that the Board's decisions to remove specific books from school libraries constituted rulemaking.

The Board's reliance on *Baytree of Inverrary Realty Partners v. City of*

---

immunity or privilege. In any event, *Littlejohn* determined that the conduct at issue there—a school's treatment of a transgender child in accordance with school policy—was "executive" as opposed to legislative action for due process purposes. *Littlejohn*, 132 F.4th at 1242.

[15] Appellants also cite the definition of the term "administrative act." App. Br. at 28-29. But that definition (a) is a subsidiary definition of the term "act" more broadly and (b) in any event does not support the notion that the exercise of discretion is inconsistent with administrative acts.

*Lauderdale*, 873 F.2d 1407 (11th Cir. 1989), reflects a fundamental misreading of that case. App. Br. at 31. *Baytree*—which predates *Crymes* and the numerous cases that rely on it—held that a decision whether to amend a zoning *ordinance* (albeit one that impacted only a single property) was a legislative act, and relied on cases holding that such ordinance amendments are legislative. 873 F.2d at 1408-09. In subsequent cases, this Court has repeatedly held that decisions to adopt or reject zoning *ordinances* are legislative, whereas decisions on specific zoning *permit applications* (*i.e.*, application of the zoning ordinance to a specific set of facts) are administrative. *See, e.g.*, *Corn*, 997 F.2d at 1392-93; *Fuller*, 2022 WL 333234, at *3. If anything, these cases further support that the number of people or properties (or schools) impacted is not the critical factor; rather, courts look to whether the act in question adopts a general rule, or applies such a rule to a specific set of facts.

Perhaps most importantly, Appellants misapprehend how to assess the impact of their decisions to remove books from libraries. App. Br. at 32-34; *see also id.* at 19. The fact that the decisions apply to all schools in the district does not make the decisions ones that impact "the general population," *Crymes*, 923 F.2d at 1485; *Smith*, 45 F.3d at 406, or a policy "of general application," *Woods*, 132 F.3d at 1420; *Brown*, 960 F.2d at 1011. These phrases refer to policies that can have broader application in the future. Even admittedly administrative decisions such as firing a school principal or superintendent or denying a zoning permit impact parties beyond

38

those directly subject to the decision (*e.g.*, teachers and students in a school or schools; neighbors and other residents of a city). Indeed, during the course of this litigation the School Board fired the county's superintendent, D.E. 219 ¶ 110, which, like the book removal decisions, had "District-wide impact and affect[ed] every school and student within the District," App. Br. at 33. Even Appellants, however, could not contend that action was therefore legislative. *See Smith*, 45 F.3d at 406 (vote to not re-appoint county clerk was administrative); *Yeldell*, 956 F.2d at 1062-63 (personnel decisions regarding specific individuals were administrative). That is because the question is not whether more than one individual or anyone not a party to the lawsuit is impacted by a particular decision, but whether the policy adopted has widespread *application* (as opposed to impact) beyond the specific facts at issue. *See Israel*, 2020 WL 2129450, at *9 ("allowing the existence of such attenuated secondary and tertiary effects to confer immunity would render the immunity analysis illusory, as virtually any action by a legislature or legislator would have such effects to *some* degree").

As the Fifth Circuit explained in explicating its similar standard, "if the action involves establishment of a *general policy*, it is legislative; if the action singles out specific individuals and affects them differently from others, it is administrative." *Hughes*, 948 F.2d at 921(emphasis added) (cleaned up). Here, the Board's votes did not establish a "general policy," even though the removed books were removed from

all school libraries; rather, the votes singled out specific books and affected them differently. Or, as the District Court held, the Board's votes "involve the case-by-case *application* of the standards in state law and school board policy to a specific book, not the *formulation* of general standards that apply to all books." *PEN II*, 787 F. Supp. 3d at 1297, D.E. 155 at 6.

Appellants' suggestion that the "district court incorrectly interpreted *Crymes* to mean a decision which impacted specific *books* was the same as those impacting specific *individuals*," App. Br. at 33, reflects Appellants' misunderstanding of the relevant legal test. The cases often speak of individuals because that is who is involved in the cases, but the clear import of *Crymes* and its progeny is that the relevant question is whether the decision at issue applies a policy to a particular subject or circumstance (be they people, buildings, or books) or establishes a rule of general applicability. As the Fifth Circuit put it in *Hughes*, "[i]f the facts used in the decisionmaking are more specific, such as those that relate to particular individuals *or situations*, then the decision is administrative." *Hughes*, 948 F.2d at 921 (emphasis added) (cleaned up).

### 3.    Appellants Misunderstand *Ellis*.

Appellants' final attempt to avoid the inevitable conclusion that the Board's decisions to remove specific books from school libraries were administrative is to hang their hat on a misreading of *Ellis*. App. Br. at 34-37.

Properly understood, *Ellis* is entirely consistent with the general principles discussed above. The key to understanding *Ellis* is that it involved the legislative function of conducting an *investigation*, as opposed to legislating. Thus, *Ellis* concluded that County Commissioners and their attorney were entitled to legislative privilege because they were "engaged in their legislative function" when they conducted an investigation into registered voters in the county, including the Ellis plaintiffs. 981 F.2d at 1191-92. That the *Ellis* court was focused on investigative powers is clear both from the facts of the case and from the court's analysis.

*Ellis* involved implementation of a consent decree concerning voting in the County. *Id.* at 1187. "Resulting from the *investigation* into voter eligibility … the names of 6,000 voters who needed to verify their qualifications to vote in Coffee County were published in the local newspaper. The published list included the four Ellises." *Id.* at 1188 (emphasis added). *See also id.* at 1191 ("the commissioners investigated the residence of electors"), 1193 ("the commission determined [voter eligibility] by investigation"). It was thus the exercise of the Commissioners' *investigative* functions that led to the ultimate determination that the Ellis plaintiffs were among a large group of ineligible voters.

And indeed, *Ellis* is analytically grounded in the notion that conducting investigations is an appropriate legislative function. The only time that *Ellis* uses the word "policy" or "policymaking" is in support of its preliminary conclusion that the

41

delineation of voting precinct lines is a legitimate legislative function. *Id.* at 1190 (*citing Crymes*, 923 F.2d at 1485). After establishing the proper legislative purpose of drawing precinct lines, the court concluded that "the Coffee County Commissioners clearly were performing their *legislative function* when they *investigated* the voting eligibility of the listed electors on the county precinct list ...." *Id.* (emphasis added). *See Bogan*, 523 U.S. at 54 (immunity attaches to "all actions taken in the sphere of legitimate legislative activity") (cleaned up).

In support of this conclusion, *Ellis* cited *McGrain v. Daugherty*, a Supreme Court case that determined that Congress has the power to compel witnesses to appear before it although "there is no provision [in the Constitution] expressly investing either house with power to make investigations and exact testimony." 273 U.S. 135, 161, 174 (1927). *See Ellis*, 981 F.2d at 1190 (citing *McGrain*); *see also McGrain*, 273 U.S. at 174 ("We are of opinion that the power of inquiry … is an essential and appropriate auxiliary to the legislative function."); *Ellis*, 981 F.2d at 1191 (*citing Yeldell*, 956 F.2d at 1062, for the proposition that "participating in committee *investigations* and proceedings are generally deemed legislative and, therefore, protected by the doctrine of legislative immunity." (emphasis added)).

*Ellis'* repeat citations to *Tenney v. Brandhove*, 341 U.S. 367 (1951)—which also involved Congress's investigative function and held that "[i]nvestigations … are an established part of representative government," *id.* at 377—also makes sense

42

in this light. *Ellis*, 981 F.2d at 1190, 1191, 1193 (citing to *Tenney* for different propositions). *See also Hernandez*, 643 F.2d at 1196 (citing *Tenney* for conclusion that "conducting an investigation" is a "legitimate legislative function").

Both the District Court's statement that its conclusion is hard to square with *Ellis*, *Pen II*, 787 F. Supp. 3d at 1297 n.3 (D.E. 155 at 6 n.3), and Appellants' argument that *Ellis* supports their position, App. Br. at 34-37, are mistaken.[16] *Ellis* is neither inconsistent with the District Court's conclusion nor supportive of Appellants' contention that the acts here at issue are legislative. *Ellis* is simply inapposite, as it did not address the question of whether the actions there at issue concerned legislative versus administrative acts. Indeed, the word "administrative" appears nowhere in the opinion, notwithstanding its citations to both *Crymes* and *Brown*. That is because *Ellis* dealt solely with the question of whether the exercise of the county government's *investigative* function qualified for legislative immunity. Perhaps for this reason, unlike *Crymes, Ellis* has *never* been cited by this Court in deciding what constitutes a legislative versus administrative act.[17]

---

[16] Appellants' description of *Ellis* as concerning "the voting status of a family," App. Br. at 35, ignores the much broader scope of the investigation at issue in that case, which identified some 6,000 ineligible voters. *Ellis*, 981 F.2d at 1188, 1191. Similarly, Appellants' claim that like in *Ellis* they "allowed challenges to percolate before a subordinate committee for review and evaluation prior to any rendering of [a] final decision" is incorrect with respect to the Superintendent-Removed Books and the Mass-Removed Books.

[17] *See Gomez v. City of Miami*, No. 23-13364, 2024 WL 4369605, at *1 (11th Cir. Oct. 2, 2024) (denial of immunity is appealable); *Code Revision Comm'n for Gen.*

Appellants selectively quote part of Plaintiffs' counsel's argument before the District Court in an apparent attempt to suggest that Plaintiffs believe *Ellis* does not support their position, App. Br. at 34, but Appellants fail to include the very next paragraph from the transcript where Plaintiffs' counsel explained that "[a]n investigation is a legislative function. And I think this is what makes *Ellis* different . . . . That's a separate kind of legislative function, and that's what was happening." D.E. 156 at 87:5-87:12. Plaintiffs' counsel may not have been eloquent, but Plaintiffs' argument has been consistent. Appellants also ignore the fact that Plaintiffs provided this same explanation of *Ellis* in the prior appeal. *See* Pls. Br. at 63-66, *Pen Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, No. 24-13896 (Doc. 28).

Notably, Appellants offer no argument for why this understanding of *Ellis* is incorrect. In the prior appeal, all they could offer in response was the statement that Plaintiffs were "hair splitting" by focusing on the investigative function at the heart of *Ellis*, and that Plaintiffs seek to cast *Ellis* as a "judicial aberration." Reply Br. at

---

*Assembly of Ga. v. Public.Resource.Org, Inc.*, 906 F.3d 1229, 1245 (11th Cir. 2018) (legislative aides entitled to immunity); *Bryant*, 575 F.3d at 1303 n.29, 1304 (legislative immunity applies to local legislators and their adjuncts); *Scott v. Taylor*, 405 F.3d 1251, 1253 n.2, 1256 n.7 (11th Cir. 2005) (immunity decisions are appealable and improper motives are irrelevant); *Smith v. Shook*, 237 F.3d 1322, 1325 (11th Cir. 2001) (grant of immunity is reviewed de novo); *Macuba v. Deboer*, 193 F.3d 1316, 1302 (11th Cir. 1999) (immunity claims are appealable); *Mastroianni v. Bowers*, 173 F.3d 1363, 1366 (11th Cir. 1999) (same); *Woods*, 132 F.3d at 1419 n.4 (good faith of legislator is irrelevant to immunity decision). These are the only Eleventh Circuit cases to ever cite *Ellis*.

43, *Pen Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, No. 24-13896 (Doc. 28). But there is no hair splitting involved—*Ellis* is clearly based on a legislature's investigative powers. And it is no "judicial aberration." *Ellis* stands for the uncontested proposition that the privilege attaches to "all actions in the sphere of legitimate legislative activity." *See Bogan*, 523 U.S. at 54. It's just that *Ellis* doesn't help elucidate whether a particular non-investigative act is legislative as opposed to administrative.

* * *

For all of these reasons, the District Court was correct in determining that the Board's votes to remove specific books from school libraries were administrative acts not subject to legislative privilege.

**CONCLUSION**

For the foregoing reasons, the Court should affirm the District Court's Order denying Appellants' motions for protective orders and/or to quash.

Dated: January 26, 2026

*/s/ Lynn Oberlander*
Lynn B. Oberlander
**BALLARD SPAHR LLP**
1675 Broadway, 19th Floor
New York, NY 10019-5820
Telephone: 212.223.0200

Michael R. McDonald
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor

45

Philadelphia, PA 19103
Telephone: 215.864.8500

Taylor Washburn
**BALLARD SPAHR LLP**
1301 Second Ave., Suite 2800
Seattle, WA 98101
Telephone: 206.331.1457

Shalini Goel Agarwal
Ori Lev
**PROTECT DEMOCRACY PROJECT**
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
Telephone: 202.579.4582

*Attorneys for Plaintiffs-Appellees*

## **<u>CERTIFICATE OF COMPLIANCE</u>**

The undersigned certify that this Brief complies with the type-volume limitations set forth in Federal Rule of Appellate Procedure 32(a)(7)(A) and Eleventh Circuit Rule 32-4 because it contains 10,879 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Eleventh Circuit Rule 32-4.

The undersigned further certify that this Brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface of Times New Roman 14-point font.

*/s/ Lynn B. Oberlander*
Lynn B. Oberlander

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 26, 2026, I electronically filed the foregoing Brief of Plaintiffs/Appellees with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Lynn B. Oberlander*
Lynn B. Oberlander
